**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**NORMAN WELLS,**

       **Plaintiff,**

**v.**                                                    Civil Action No.  **3:24cv61**

**TRANS UNION, LLC,**
SERVE:   Corporation Service Company Reg. Agent
          100 Shockoe Slip
          2nd Floor
          Richmond, VA 23219

**EQUIFAX INFORMATION SERVICES, LLC,**
SERVE:   Corporation Service Company, Reg. Agent
          100 Shockoe Slip
          2nd Floor
          Richmond, VA 23219

**EXPERIAN INFORMATION SOLUTIONS, INC.,**
SERVE:   CT Corporation System
          4701 Cox Rd,
          Ste. 285
          Glen Allen, VA 23060

**and**

**CAPITAL ONE FINANCIAL CORPORATION**
SERVE:   Corporation Service Company, Reg. Agent
          100 Shockoe Slip
          2nd Floor
          Richmond, VA 23219

       **Defendants.**

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, Norman Wells, by counsel, and for his Complaint against Defendants Trans Union, LLC ("Trans Union"), Equifax Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and Capital One Financial Corporation ("Capital One"), he states as follows:

### PRELIMINARY STATEMENT

1.     This is an action for statutory, actual, and punitive damages, costs, and attorney fees brought to enforce Plaintiff's civil rights pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681x ("FCRA").

2.     Trans Union, Equifax, and Experian are the USA's major consumer reporting agencies (hereinafter, these 3 are collectively referred to as the "CRAs" or "CRA Defendants").

3.     The FCRA demands that CRAs utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

4.     The FCRA's accuracy provision demands that CRAs take actual steps to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply parrot information they receive from entities like Capital One, particularly when a consumer makes a dispute about information reported.

5.     Also, when a consumer like Plaintiff disputes the accuracy of information through the CRAs, those disputes are transmitted to the party furnishing the information. Here, that entity is Capital One (the "Furnisher"). The FCRA demands that each party separately conduct a

reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

6.      Plaintiff brings claims under Section 1681e(b) against Trans Union, Equifax, and Experian because each reported inaccurate account information about Plaintiff regarding a fraudulent Capital One account. When Plaintiff disputed the inaccuracies, Trans Union, Equifax, and Experian did not reasonably investigate, also violating Section 1681i.

7.      The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly true as to how Trans Union, Equifax, and Experian have complied with their now 50-year-old obligation to conduct a meaningful accuracy investigation. Trans Union, Equifax, and Experian have been repeatedly sued by consumers, sanctioned by regulators, and reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-creditors instruct. Had the Defendant CRAs followed that advice and heeded those warnings, Plaintiff would not have been harmed.

8.      Likewise, Capital One violated the FCRA, Section 1681s-2(b), when it received Plaintiff's disputes from the CRAs and failed to reasonably investigate those disputes. Instead, discovery will show all Capital One did was consult its own records about the account and confirm to the agencies the inaccurate information it was already reporting. Capital One failed to correct the fraudulent reporting on Plaintiff's credit despite receiving ample notice and an FTC Identity Theft Report from Plaintiff.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

3

10.     Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(2). A substantial portion of the events giving rise to the claim occurred in this District and Division.

## PARTIES

11.     Plaintiff is a natural person, and a "consumer" as defined by 15 U.S.C. § 1681a(c).

12.     Trans Union is a foreign limited liability company authorized to do business in the State of Virginia through its registered agent in Richmond, VA.

13.     Trans Union is a "consumer reporting agency," as defined by 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

14.     Trans Union disburses consumer reports to third parties under contract for monetary compensation.

15.     Equifax is a foreign limited liability company authorized to do business in the State of Virginia through its registered agent in Richmond, VA.

16.     Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

17.     Equifax disburses consumer reports to third parties under contract for monetary compensation.

18.     Experian is a foreign corporation authorized to do business in the State of Virginia through its registered agent in Richmond, VA.

19.     Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

20.     Experian disburses consumer reports to third parties under contract for monetary compensation.

21.     Capital One Financial Corporation is a Stock Corporation authorized to do business in the Commonwealth of Virginia with its principal office located in McLean, Virginia and its registered agent in Richmond, VA.

22.     Capital One is a "furnisher" of information as defined and governed by 15 U.S.C. § 1681s-2.

## FACTUAL ALLEGATIONS

### *Sections 1681e(b) and 1681i(a) of the Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the CRA Defendants' Creditor-Customers*

23.     "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . In enacting FCRA Congress adopted a variety of measures designed to ensure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v.*

*Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

24.     "The . . . FCRA . . . was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and reasonable manner." *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir. 1995) (citations omitted). "'These consumer-oriented objectives support a liberal construction of the FCRA,' and any interpretation of this remedial statute must reflect those objectives." *Cortez v. Trans Union, LLC,* 617 F.3d 688, 706 (3d Cir. 2010) (quoting *Guimond,* 45 F.3d at 1333).

25.     Over a decade ago, the Third Circuit apprised Trans Union of the high duty of care imposed by Section 1681e(b):

> [T]he distinction between "accuracy" and "maximum possible accuracy" is not nearly as subtle as may at first appear, it is in fact quite dramatic….
>
> There are, of course, inherent dangers in including any information in a credit report that a credit reporting agency cannot confirm is related to a particular consumer. Such information is nearly always "used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for ... credit." 15 U.S.C. § 1681a(d)(1). Allowing a credit agency to include misleading information as cavalierly as Trans Union did here negates the protections Congress was trying to afford consumers and lending institutions involved in credit transactions when it enacted the FCRA….
>
> Congress surely did not intentionally weave an exception into the fabric of the FCRA that would destroy its remedial scheme by allowing a credit reporting agency to escape responsibility for its carelessness whenever misleading information finds its way into a credit report through the agency of a third party….
>
> Trans Union remains responsible for the accuracy in its reports under the FCRA and it cannot escape that responsibility as easily as it suggests here. Congress clearly intended to ensure that credit reporting agencies exercise care when deciding to associate information with a given consumer, and the record clearly supports the jury's determination that Trans Union did not exercise sufficient care here.

*Cortez v. Trans Union, LLC,* 617 F.3d 688, 709-10 (3d Cir. 2010).

26.     Section 1681e(b) sets forth the CRAs' overall du[t]y:

> (b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

27.     Section 1681i(a), on the other hand requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through their dispute:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly…of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file … before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

28.     Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

29.     It has long been the law that a CRA, such as Trans Union, Equifax or Experian, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item.  *See, e.g., Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to

contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

30.     That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other  sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir.1997).  Accordingly, "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id.* The Court held that Trans Union's reading of Section 1681i(a) to require only parroting "would require it only to replicate the effort it must undertake in order to comply with § 1681e(b)[,] render[ing] the two sections largely duplicative of each other." *Id.*

31.     As the Fourth Circuit explained in *Johnson v. MBNA*:

The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); *see* Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

32.     Further, as the CRA Defendants are aware, Courts have held that even though the term "investigation" is not used in § 1681e(b), it is clear that Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . .." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

33.     It has long been the law – since 1970 in fact – that:

[W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Federal Trade Commission, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT

(July 2011), at 67.[1]

### *Sections 1681s-2(b) of The Fair Credit Reporting Act Also Places a Separate and Intentionally Redundant Duty on Furnishers Such as Capital One to Perform a Detailed and Systematic Investigation of Consumer Disputes*

34.     Today, furnishers such as Capital One have their own independent duties under the FCRA, principally those found at 15 U.S.C. § 1681s-2.  The duties on furnishers were enacted almost thirty years ago, in 1996. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

35.     Furnishers' independent duties under the FCRA include independently investigating consumer disputes by reviewing all relevant information provided by the CRAs.

---

[1] Available at https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf.

Further, the furnisher must report the results of this investigation to the CRAs and accurately correct, update, or delete incorrect information previously reported to the CRAs.

36.     Additionally, Capital One has long been aware that a furnisher must fully and accurately report to the CRAs the results of its investigation, including whether the consumer disputes such reporting.  *Saunders v. Branch Banking and Tr. Co. Of VA*, 526 F.3d 142 (4th Cir. 2008) (Creditor's failure to report disputed nature of debt to all credit reporting agencies (CRAs), after receiving notice of dispute from one CRA, and conducting investigation and verification, was cognizable as violation of Fair Credit Reporting Act's (FCRA) duty to review and update reports for inaccuracies and omissions.)

### *Plaintiff Discovers the CRA Defendants were Reporting the Fraudulent Furnisher Account and Disputes Those Inaccuracies*

37.     Plaintiff is the victim of identity theft.

38.     An unknown individual opened a variety of consumer accounts and filed tax returns in Plaintiff's name using Plaintiff's personal identifiers.

39.     In or around December of 2022, Plaintiff applied for credit with two potential lenders and was denied each time.

40.      In January of 2023, Plaintiff discovered extensive false information in his credit reports, including inaccurate addresses where he never resided, employers he never worked for, phone numbers he never owned, and credit card accounts he never opened.

41.      The fraudulent credit card accounts that Plaintiff discovered were a Capital One account with a charged-off balance of approximately $747.00 (the "Capital One account") and a First Premier account with a charged-off balance of approximately $477.00 (the "First Premier account).

42.     Plaintiff did not open the Capital One and First Premier accounts, nor did he authorize anyone to open the Capital One and First Premier accounts on his behalf.

43.     On or around April 3, 2023, Plaintiff disputed the inaccurate information, including the fraudulent and derogatory Capital One and First Premier accounts, with each of the CRA Defendants. Plaintiff sent each dispute letter via USPS Certified Mail, Return Receipt Requested.

44.     On or around April 21, 2023, Trans Union notified Plaintiff that it had "updated" the information for the Capital One account. However, Trans Union continued to inaccurately report the derogatory Capital One account as belonging to Plaintiff.  In addition, Trans Union notified Plaintiff that it had verified the First Premier account as accurate.

45.     On or around April 21, 2023, Equifax notified Plaintiff that it had verified the fraudulent Capital One account as accurate. Equifax did not address Plaintiff's dispute of the First Premier account.

46.     Upon information and belief, Plaintiff did not receive dispute results from Experian in response to his April 2023 dispute letter.

47.     In early July 2023, Plaintiff obtained his Trans Union credit report, which showed that Trans Union was still reporting the fraudulent and derogatory Capital One and First Premier accounts as belonging to Plaintiff.

48.     On or around July 21, 2023, Plaintiff cancelled his account with Experian.

49.     On or around July 28, 2023, Plaintiff learned that Experian was still reporting the fraudulent and derogatory accounts with Capital One and First Premier on his credit.

50.     On or around August 15, 2023, Plaintiff obtained his Equifax credit report. While the report no longer included the fraudulent First Premier account, Equifax was still reporting the fraudulent and derogatory Capital One account.

51.     On or around September 27, 2023, Plaintiff again disputed the inaccurate information on his Experian credit report. Plaintiff sent the dispute letter via USPS Certified Mail, Return Receipt Requested.

52.     Approximately two weeks after Plaintiff mailed his dispute letter to Experian, he received an email from Experian containing the dispute results. Experian emailed Plaintiff his dispute results despite Plaintiff having previously cancelled all Experian products, and despite Plaintiff sending his dispute to Experian via USPS.

53.     The dispute results from Experian revealed that while the First Premier Account had been deleted, Experian had chosen to continue reporting the fraudulent and derogatory Capital One account as belonging to Plaintiff.

54.     Upon information and belief, all three CRA Defendants are still reporting the fraudulent Capital One account on Plaintiff's credit files.

### The CRA Defendants Did Not and Do Not Conduct Any Investigation of Most Consumer Disputes

55.     Unknown to Plaintiff until this lawsuit, it has long been the practice of Trans Union, Equifax, and Experian to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas.  Equifax and Trans Union use a vendor, previously known as Intelenet Global Services and now as Teleperformance.

56.     Experian uses a sister company, Experian Chile (or Experian Costa Rica) to process its mail disputes.[2]

---

[2] Defendant Experian outsources its dispute procedures to an affiliated company, Experian Services Chile, S.A, in Santiago, Chile. Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). Such was confirmed in a recent case in the Eastern District of Virginia with Plaintiff's Counsel opposing, wherein Experian produced its Chilean dispute investigator for remote deposition through a Rule 30(b)(1) notice without

57.     Here is how the written mail dispute process actually works: for Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure, or other communication.  That mailbox company receives consumer disputes and scans them into a batch with other disputes.

58.     Trans Union, on the other hand, receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania.

59.     Both Teleperformance and the Experian affiliates use low-wage employees to work quickly to process consumer dispute letters received. The employees skim the letters and select one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits.  For example, the most common relevant code is: "01 Not his/her."

60.     Teleperformance agents and Experian Chile agents are not allowed to do any of the following things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

61.     The dispute processing agents are not hired to perform actual FCRA investigations. Instead, the agent's sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu, and then click that code.

62.     In fact, all three credit reporting agencies strongly encourage consumers to make disputes through their online websites.  When consumers do so, the consumer must click one of just a few available dispute reasons (such as "The balance and/or past due amount are/is incorrect").  The online dispute then is outputted into the "e-Oscar" system described below

---

opposition. *Sublett v. Nissan of Richmond, LLC, et al.*, No. 3:20-cv-156 (E.D. Va.). To the extent Experian would argue here that it cannot produce its Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue her 1681i failure-to-investigate claim on the same theory—no investigation was conducted by the CRA—as she alleges against Equifax for its farming-out investigations to Teleperformance.

without ever touching human hands or being read by human eyes at Equifax, Trans Union, or Experian.  It gets sent to the Defendant CRAs' creditor customers (such as Capital One) for their sole review and consideration.

63.     Both Equifax and Trans Union have taken the position in other litigation that they have no control over Teleperformance. For example, under oath before another court, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv.*, Case No. 4:19-cv-584, ECF 47-1 (M.D. Fla. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

64.     Trans Union has taken and succeeded with this same position. *See, e.g.*, *Wilcox v. Servis One, Inc.*, No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that Trans Union did not have control or the ability to produce for deposition Indian employees of Intelenet).

65.     Regardless of whether these statements by the CRAs are correct, the credit reporting agencies believe that they cannot direct, control, manage, or reliably influence the employees of their respective third-party outsource vendors.

66.     Trans Union, Equifax, and Experian themselves did not conduct any reinvestigation of Plaintiff's many disputes.  Instead, they merely caused them to be removed from their control to be saved within a database by an overseas data-processing vendor.

***The CRA Defendants Forwarded Plaintiff's Disputes
to Capital One, Who Did Nothing***

14

67.     In each instance in which Plaintiff disputed the Capital One account with the CRAs, the CRAs forwarded Plaintiff's disputes to Capital One using an electronic system called "e-Oscar," which is an industry-wide process by which consumer disputes are electronically communicated to furnishers and dispute results back to CRAs.

68.     On information and belief, e-Oscar is also the system by which Capital One has agreed it will accept consumer disputes from the CRAs.

69.     Each instance in which Capital One received one of Plaintiff's disputes from a CRA, Capital One became obligated under the FCRA to investigate that dispute.

70.     Plaintiff's disputes to Capital One to attempt to have it reinvestigate his complaints went unanswered, as Capital One continues to report the fraudulent account to the CRAs.

71.     Capital One failed to reinvestigate Plaintiff's complaints.

72.     Despite Plaintiff's diligent efforts to use the legal means that are available to him to report his victimization by identity theft, Capital One continued (and continues still) to report the fraudulent account as accurate to the CRAs. Discovery will show that all Capital One did when supposedly investigating Plaintiff's disputes from the CRAs was consult its own internal account records and simply report back to the CRAs the same inaccurate information Plaintiff was disputing.

73.     On dates better known to Trans Union and Capital One, Trans Union furnished Plaintiff's disputes to Capital One.

74.     On dates better known to Equifax and Capital One, Equifax furnished Plaintiff's disputes to Capital One.

75.     On dates better known to Experian and Capital One, Experian furnished Plaintiff's disputes to Capital One.

76.    In violation of § 1681s-2(b)(1)(A) of the FCRA, Capital One failed to reasonably reinvestigate Plaintiff's disputes that Capital One received from Trans Union, Equifax, and Experian.

77.    Capital One further violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to correct, delete, or permanently block the account after receiving Plaintiff's disputes from Trans Union, Equifax, and Experian.

78.    The Defendant CRAs responded to Plaintiff's disputes, claiming the information was reported verified as accurate and the information was updated. This response confirms that the Defendant CRAs communicated Plaintiff's disputes to Capital One.

79.    Upon information and belief, CRA Defendants timely notified Capital One of Plaintiff's disputes, via e-OSCAR or otherwise, and provided the supporting documents with Plaintiff's disputes.

80.    Upon information and belief, Capital One received timely notice of Plaintiff's disputes from Trans Union, Equifax, and Experian, and the supporting documents submitted with Plaintiff's disputes.

81.    By its actions as described herein, Capital One furnished and communicated false credit information regarding Plaintiff.

### *Capital One Repeatedly Obtained and Used Plaintiff's Consumer Report(s) Without a Permissible Purpose*

82.    Accessing consumer reports is presumptively illegal. To overcome this presumption, a party seeking to access consumer reports must have a permissible purpose for doing so and must certify to the agency from which it seeks reports the FCRA purpose for which it will use the reports and that it will use the reports for no other purpose. 15 U.S.C. § 1681(f).

83.     One such permissible purpose that arises in the credit realm is for reports to issue "[t]o a person which [the reporting agency] has reason to believe—A intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer." 15 U.S.C. § 1681b(a)(3)(A).

84.     Likewise, Courts have long held that reports issued to a user involving an extension of credit or for collection purposes as to credit fall within the coverage of § 1681b(a)(3)(A). *Huertas v. Galaxy Asset Mgmt.*, 641 F.3d 28, 34 (3d Cir. 2011) ("the statute expressly permits distribution of a consumer report to an entity that 'intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer.'"); *Korotki v. Thomas, Ronald & Cooper, P.A.*, 131 F.3d 135 (4th Cir. 1997) (Defendant "was seeking to collect an account owed by the consumer, § 1681(b)(3)(A), likewise a permissible purpose"); *Cooper v. Pressler & Pressler, LLP*, 912 F. Supp. 2d 178, 188 (D.N.J. 2012) ("Capital One could rightfully obtain a copy of Plaintiff's consumer report from a CRA in order to review, or collect upon, Plaintiff's MasterCard credit card account.").

85.     Apart from 15 U.S.C. § 1681b(a)(3)(A), no other permissible purpose could conceivably allow Capital One to access Plaintiff's consumer reports.

86.     Capital One first accessed Plaintiff's credit file in connection with its issuance of the fraudulent account in July of 2021. The information Capital One received purportedly authorizing it to access Plaintiff's consumer report(s) bore multiple hallmarks of identity theft. Even a cursory evaluation of the information submitted to Capital One to purportedly authorize it to access Plaintiff's credit report to issue a consumer account would have revealed that the

application was fraudulent. Nonetheless, Capital One illegally accessed Plaintiff's consumer report(s) and then issued a fraudulent consumer account based on an illegally obtained consumer report(s).

87.     But for Capital One's illegal access of Plaintiff's consumer reports, the fraudulent Capital One account would not have been created.

88.     Capital One used information from one or more illegally obtained consumer report(s) regarding Plaintiff to further its illegal effort to issue a fraudulent consumer account.

89.     Capital One illegally accessed Plaintiff's consumer reports on multiple occasions, including but not limited to occasions on or around July 03, 2021.

90.     Capital One continued to illegally access Plaintiff's consumer report(s) even after Plaintiff disputed the Capital One account as fraudulent.

### *Plaintiff Suffered Actual Harm*

91.     Trans Union, Equifax, and Experian continued to report the derogatory Capital One account on Plaintiff's credit reports even after being notified that this information is false. Upon information and belief, Trans Union, Equifax, and Experian are *still* reporting the fraudulent Capital One account on Plaintiff's credit.

92.     Plaintiff attempted to resolve these matters with Defendants and his credit was significantly destroyed by Defendants' failure to correct the inaccurate reporting.

93.     As a result of the inaccurate reporting and illegal use of Plaintiff's reports, Plaintiff has suffered damages, including, but not limited to:

      a.  Stress associated with being denied credit and associated delays in applying for future lines of credit;

b.   Monies lost by attempting to fix his credit, e.g., communication costs, postage for disputes;

c.   Loss of time attempting to correct the inaccuracies;

d.   Stress associated with attempting to resolve this matter; and

e.   Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life, including but not limited to: anxiety, depression, loss of appetite, loss of concentration, aggravation of high blood pressure, irritability, humiliation and embarrassment, headaches, feelings of fear and panic, heart palpitations, irritability, shortness of breath, stomach pain, sleep loss, harm to reputation, and loss of privacy.

### *Defendants' Conduct was Willful*

94.   The FCRA allows for a remedy for a "willful" violation.  A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007).  A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

95.   Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

96.   As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years.  The language of § 1681e(b) has not changed.  The CRA

Defendants' dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

97.     The CRA Defendants have received numerous disputes and other complaints regarding the furnisher at issue in this case—sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

98.     Just in federal court alone, during the past decade, Capital One has had to defend approximately 248 consumer credit lawsuits.

99.     In many or even most of these FCRA lawsuits brought by a consumer, one or more of the CRA Defendants was a named co-defendant.

100.    CRA Defendants knew or should have known of this litigation history.

101.     CRA Defendants use and have access to PACER to investigate and monitor consumer complaints.

102.    The CFPB has maintained a Consumer Complaint database since 2017.  It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

103.    Each Defendant regularly receives unredacted consumer dispute details from this database.

104.    Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Trans Union.

105.    Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

106.    Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Experian.

107.    Further, over 190,000 of the CFPB complaints against Equifax, more than 160,000 complaints as to Trans Union, and over 145,000 complaints about Experian were based largely on their failure to reasonably investigate consumer disputes.

108.    Just in the last 12 months alone, Trans Union, Equifax, and Experian have each been sued by consumers alleging their violation of the FCRA over 2,000 times.  Most of these alleged that the Defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute.  This complaint history has been true for nearly every year over the last decade.

109.    While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the CRA Defendants on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

110.    Trans Union, Equifax, and Experian have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74

(D. Or. 2011)("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs' account. Many courts, including this one, have concluded that when a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

111.    Equifax has even been warned by its home District Court, the Northern District of Georgia, which detailed:

> Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b) (1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.
>
> To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.*; *see also Henson v. CSC Credit Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau,* 608 F.Supp. 972, 976 (M.D. Fla.1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D. Ga. Aug. 29, 2005).

112.    Defendants have long had specific notice of these requirements. The seminal Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was a Trans Union case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). Defendants' notice was so substantial that another court instructed the jury in a § 1681i(a) trial:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

113.    Defendants have also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

114.    In 2015, a large group of state Attorneys General forced a consent order from the CRA Defendants by which they were required to develop procedures necessary to comply with the FCRA.[3]  The AG Settlement required amongst many changes and mandates that the Defendant comply with § 1681i(a).

115.    The AG Settlement also required the CRA Defendants to conduct significant research and data gathering—even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case.  Notwithstanding these requirements, the Defendants did not meaningfully comply with the AG Settlement in these regards.

116.    Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system.  For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute.  That report was updated in 2019.  AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[4]

---

[3] *Available at* https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Release/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

[4] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

117.    The NCLC Report summarized its context:

Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and Trans Union), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

118.    Among many of Defendants' accuracy failures, the NCLC Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**.  Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two- or three-digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

119.    Proportionately similar, Capital One has also been sued in federal court repeatedly for consumer credit claims by consumers – most involving alleged violations of the FCRA.

120.    From January 2023 to January 2024, Capital One has received over 600 consumer complaints from the CFPB regarding its credit reporting errors.

121.    Since the inception of the CFPB database, Capital One has received over 9,800 consumer complaints from the CFPB regarding its credit reporting errors. Of those complaints, almost 4,500 were from consumers asserting that the information Capital One was reporting on their credit belonged to someone else.

122.    Capital One was duly notified, and its legal team or other management personnel in charge of Fair Credit Reporting Act (FCRA) compliance had reviewed *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142 (4th Cir. 2008).

123.    Capital One was duly notified, and its legal team or other management personnel in charge of Fair Credit Reporting Act (FCRA) compliance had reviewed *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295 (11th Cir. 2016).

124.    Capital One was duly notified, and its legal team or other management personnel in charge of Fair Credit Reporting Act (FCRA) compliance had reviewed *Johnson v. MBNA,* 357 F.3d 426 (4th Cir. 2004).

125.    Capital One was duly notified, and its legal team or other management personnel in charge of Fair Credit Reporting Act (FCRA) compliance had reviewed *Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246 (4th Cir. 2017).

126.    Capital One was duly notified, and its legal team or other management personnel in charge of Fair Credit Reporting Act (FCRA) compliance had reviewed *Bach v. First Union Nat. Bank*, 149 F. App'x 354 (6th Cir. 2005).

127.    Despite the notice and judicial, regulatory, and public interest criticism, Defendants have refused to change their dispute investigation process because it would cost too much money to do so.

128.    Defendants' procedures imposed on Plaintiff and similarly situated consumers an unjustifiably and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

### CLAIMS FOR RELIEF

### COUNT I:
### VIOLATION OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681e(b)
### *against Trans Union, Equifax, and Experian*

129.    Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

130.    Trans Union, Equifax, and Experian each violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files they published and maintained concerning Plaintiff when they reported the inaccurate account information from Capital One and First Premier.

131.    As a result of Trans Union, Equifax, and Experian's violations of 15 U.S.C. §1681e(b) Plaintiff suffered actual damages, including but not limited to: lost credit opportunities, time attempting to get the errors fixed, money spent on postage for dispute letters, anxiety, depression, loss of appetite, loss of concentration, aggravation of high blood pressure, irritability, humiliation and embarrassment, headaches, feelings of fear and panic, heart palpitations, irritability, shortness of breath, stomach pain, sleep loss, harm to reputation, and loss of privacy.

132.    Further, after Plaintiff's disputes put them on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of their creditor-customers, Trans Union, Equifax, and Experian each ignored that information and did not use any human or substantive review to confirm and verify that its procedures were ensuring maximum possible accuracy of Plaintiff's credit reports.

133.    Trans Union, Equifax, and Experian each furnished multiple consumer reports to third parties containing the inaccurate tradeline information and they did so after receiving notice of these inaccuracies.

134.    The violations by Trans Union, Equifax, and Experian were willful, rendering each of the CRA Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Trans Union, Equifax, and Experian were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

135.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Equifax, Trans Union, and Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## COUNT II:
### VIOLATION OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681i(a)
#### *against Trans Union, Equifax, and Experian*

136.    Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

137.    Trans Union, Equifax, and Experian each violated 15 U.S.C. § 1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine whether the disputed information was

inaccurate and record the current status of the disputed information or delete the item from each of Plaintiff' credit files.

138.    Trans Union, Equifax, and Experian each violated 15 U.S.C. § 1681i(a)(2) by conduct which includes, but is not limited to, failing to send to the furnisher all relevant information that they each received with Plaintiff's disputes.

139.    Trans Union, Equifax, and Experian each violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff as to the Furnisher account.

140.    Trans Union, Equifax, and Experian each violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate information from Plaintiff's credit files or modify the item of information upon a lawful reinvestigation.

141.    After it received Plaintiff's April 2023 Dispute Letter, Experian violated 15 U.S.C. § 1681i(a)(6) by failing to provide written notice to Plaintiff of the results of a reinvestigation not later than 5 days after the completion of a reinvestigation.

142.    As a result of Trans Union, Equifax, and Experian's violations of 15 U.S.C. § 1681i(a), Plaintiff suffered actual damages, including but not limited to: lost credit opportunities, time attempting to get the errors fixed, money spent on postage for dispute letters, anxiety, depression, loss of appetite, loss of concentration, aggravation of high blood pressure, irritability, humiliation and embarrassment, headaches, feelings of fear and panic, heart palpitations, irritability, shortness of breath, stomach pain, sleep loss, harm to reputation, and loss of privacy.

143.    The violations by Trans Union, Equifax, and Experian were willful, rendering each of the CRA Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Trans Union, Equifax, and Experian

were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

144.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Trans Union, Equifax, and Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT III:**
**VIOLATION OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)(1)(A) & (B)**
***against Capital One***

145.    Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

146.    Capital One violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully conduct a reasonable investigation of Plaintiff's disputes after his disputes were furnished to it by Trans Union, Equifax, and Experian.

147.    Capital One violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided when Trans Union, Equifax, and Experian forwarded Plaintiff's disputes to Capital One.

148.    As a result of Capital One's conduct, action, and inaction, Plaintiff suffered damage as alleged above, including by example only and without limitation: lost credit opportunities, time attempting to get the errors fixed, money spent on postage for dispute letters, anxiety, depression, loss of appetite, loss of concentration, aggravation of high blood pressure, irritability, humiliation and embarrassment, headaches, feelings of fear and panic, heart palpitations, irritability, shortness of breath, stomach pain, sleep loss, harm to reputation, and loss of privacy.

149.    The violations by Capital One were willful, rendering Capital One liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In

the alternative, Capital One was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

150.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Capital One in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT IV:**
**VIOLATION OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)(1)(E)**
*against Capital One*

151.    Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

152.    On one or more occasions within the past two years, by example only and without limitation, Capital One violated 15 U.S.C. § 1681s-2(b)(1)(E) by publishing the inaccuracies within Plaintiff's credit files with Trans Union, Equifax, and Experian and by failing to correctly report results of an accurate investigation to Trans Union, Equifax, and Experian.

153.    Plaintiff's disputes were, at a minimum, *bone fide*.

154.    On information and belief, Plaintiff alleges that Capital One's employees or agents did not make a mistake (in the way in which they followed Capital One's procedures) when they received, processed, and responded to the Trans Union, Equifax, and Experian ACDVs.

155.    On information and belief, Plaintiff alleges that Capital One has not materially changed its FCRA investigation procedures.

156.    As a result of Capital One's conduct, action, and inaction, Plaintiff suffered damage as alleged above, including by example only and without limitation: lost credit opportunities, time attempting to get the errors fixed, money spent on postage for dispute letters, anxiety, depression, loss of appetite, loss of concentration, aggravation of high blood pressure, irritability, humiliation

and embarrassment, headaches, feelings of fear and panic, heart palpitations, irritability, shortness of breath, stomach pain, sleep loss, harm to reputation, and loss of privacy.

157.   The violations by Capital One were willful, rendering Capital One liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Capital One was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

158.   Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Capital One in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

### COUNT V:
### VIOLATION OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681b(f)
### *against Capital One*

159.   Plaintiff realleges and incorporates the foregoing paragraphs as it fully set out herein.

160.   Capital One repeatedly violated 15 U.S.C. § 1681(b)(f) by unlawfully obtaining Plaintiff's consumer reports without Plaintiff's written authorization or a permissible purpose.

161.   Capital One also violated 15 U.S.C. § 1681b(f) by failing to accurately and lawfully certify a permissible purpose when accessing Plaintiff's consumer report(s).

162.   Plaintiff's consumer report(s) contained a wealth of private information which Capital One had no right to access absent a specific Congressional license to do so.

163.   As a result of Capital One's conduct, action, and inaction, Plaintiff suffered damage as alleged above, including by example only and without limitation: lost credit opportunities, time attempting to get the errors fixed, money spent on postage for dispute letters, anxiety, depression, loss of appetite, loss of concentration, aggravation of high blood pressure, irritability, humiliation

and embarrassment, headaches, feelings of fear and panic, heart palpitations, irritability, shortness of breath, stomach pain, sleep loss, harm to reputation, and loss of privacy.

164.    The violations by Capital One were willful, rendering Capital One liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Capital One was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

165.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Capital One in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## DEMAND FOR RELIEF

Plaintiff therefore respectfully requests that this Court:

(1)    Award Plaintiff actual and punitive damages for violations of the FCRA by Trans Union, Equifax, Experian, and Capital One;

(2)    Award Plaintiff attorney's fees and costs under the FCRA;

(3)    Award Plaintiff pre-judgment and post-judgment interest at the legal rate; and

(4)    Award other relief as the Court deems appropriate.

**TRIAL BY JURY IS DEMANDED.**

**NORMAN WELLS**

By:

_/s/ Adam Wade Short____
Adam W. Short, VSB #98844

Leonard A. Bennett, VSB #37523
Mark C. Leffler, VSB #40712
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
Email: mark@clalegal.com
Email: adam@clalegal.com

*Counsel for Plaintiff*